I would like to reserve a few moments at the end, should rebuttal be necessary. This appeal raises five issues and what I would like to do, because of the time constraint, is to just highlight some of the points that I think are important as to some of those issues and then focus really on the issue of the admission of the Mexican mafia evidence. With regard to the first issue, that the trial court abused its discretion in refusing to continue the trial, the government argues, mentions in its brief, the fact that this was raised after there had been some amount of jury selection. And really the first two issues are interrelated. The reason that this was raised at that time was not Mr. Marquez's fault. It wasn't as though Mr. Marquez waited for the jury selection to happen and then said, wait a minute, we're not ready to go to trial. My counsel hasn't seen me very much. I'm surprised. I don't even know what the defense is going to be. There had, in fact, and I realize there is an issue about the admissibility or whether this court can recognize those four letters. But for the moment, let me just assume, unless you want me to just stop on that issue, that these letters that were sent to the court, we know they were sent to defense counsel. We know that they were in the docket. The government says, well, we only just got page one. Three of the four letters, clearly there is only page one. Let me tell you the problem I have with this and you set me straight. Okay, I'll try. I take your point that the guy was complaining about his lawyer even up to the day of trial. And the judge probably didn't do everything he could have done to inquire what the problem was. Okay, I take that as a given. But then I look for the second half of the argument. And because the lawyer didn't visit the client, what happened? Usually we get these kind of cases, they say that the lawyer didn't call my alibi witness, or he didn't prepare me to testify, or he talked me out of testifying, or he encouraged me to testify, you know, all because he was ill-prepared. I don't see anywhere in the brief that counsel did anything that reflects, you know, a lack of preparation or anything else. Well, I think that, I think where it comes into play is the issue of whether an attorney has an obligation when he's representing someone who is facing prison for the rest of his life to communicate enough with his client so that his client is not surprised when the defense, whatever the defense happens to be, is presented. Now with respect to your specific issue, I agree that additional evidence would have to be, would be required to raise this issue on habeas on the issue of, so what, which is what you're really saying. Yeah, I mean, he's not entitled to a babysitter or a best friend. You know, if he says the lawyer didn't see me, and as a result of that, you know, he didn't, he didn't raise my mental competency, or he didn't see me, and he didn't call my witnesses. That I get. There's nothing, all he says is he didn't see me. Well, there is a difference between a babysitter and someone who is in custody for four years and his lawyer comes to see him three or four times. Okay, but how did that manifest itself? Well, it manifested itself in, number one. He didn't have a meaningful relationship with his lawyer, but that's about, that's about all you've told us. How can you, how can you present a defense? How can you, as an attorney, represent someone? Well, he didn't present a defense, and he doesn't claim that the defense wasn't a valid defense. He claims that he didn't know what the defense was going to be. That he says, but he didn't say it wasn't a valid defense. That's true. That's true, and I agree with you that to that extent, if there was going to be something that would have been or could have been presented as a defense and wasn't because counsel was ineffective for, and not seeing him enough, that would have to be raised on habeas. But what I'm saying is that you really can't, you can't untangle the first claim and the second claim. This is clearly a case where there were problems. At one of the letters, the client says, my lawyer is a liar and I don't trust him. The government says, well, there was really no indication that there was a breakdown in the attorney-client relationship. When a client says, my attorney is a liar and I don't trust him, there's been a breakdown in the attorney-client relationship, and that really goes to the second issue, if I can proceed. Well, I thought part of the problem here was... May I just get some water on this? Yeah, sure. I'm done here. I thought part of the problem was that he was being transferred around to various Bureau of Prisons and private detention facilities because it was a disciplinary problem. So that obviously impacted his lawyer's ability to meet with him, didn't it? I don't think that there's evidence in the record that there's statements about why he was transferred around. He was threatening to foment a riot at the San Diego detention facility? That's in the record. Well, I understand that, but that really doesn't have anything to do with the fact, I don't think, that a lawyer goes to see someone two, three, or four times a year and stays for five minutes. That's unrelated. I guess the question, what I'm really asking you is, and I think you alluded to it a little earlier, this is the type of information that really should be fleshed out on a collateral challenge where, if appropriate, the district court can hold an evidentiary hearing and we can answer some of these gaps. You're pressing the claim on direct appeal here, and I'm wondering whether the better resolution of the claim at this point is for us to simply defer ruling on it pending subsequent collateral challenge. I understand, and actually, Judge Lorenz did ask for that. He said, he suggested at one point on the first day of trial when the issue was fleshed out really for the first time, even though there had been two letters prior to that time, he said something should be in writing so that I can look at it. Perhaps this should be in writing. I have a problem here. I had not been aware previously of this local rule in the Southern District of California that you cannot communicate directly with the court if you're represented by counsel, and so the letters are, I guess, are lodged but not docketed in a copy. No, they are docketed. They are docketed. But the court won't read them under the rule. They're instead sent to the lawyer of the client. Is that right? Yes. They're sent to the client. They're sent to the lawyer for the client. They're docketed with a face page, and that's in the excerpt of clerk's record, and the letter is also attached. So under that rule, the only thing we know for sure is that the judge didn't read them for that reason. We don't know that. We know that the judge said he didn't read the one that was on the day of trial. I'm assuming if Judge Lorenz says he didn't read it, he didn't read it. Well, I mean, isn't that the, if the rule forbids the client from communicating with the court, and the court at least says with regard to one letter inciting to the rule, I didn't read it, wouldn't it be logical to conclude that the purpose of the rule is to forbid direct communication? Absolutely. Absolutely. But the parties knew, the government knew, and counsel knew that there was a real problem in the relationship. Now, do I think the government should have raised this issue? Actually, I do, but I don't have any authority to support that. But I definitely think counsel at this point in time had an obligation to do something other than say, at the time of argument, well, you know, there is no lawyer, unless I had no other cases, there is no lawyer that Mr. Marquez would be satisfied with. There is a big difference between that and seeing someone who's facing life two, three, or four times a year. Well, what do we do with the fact that, as you acknowledged in your opening, the motion for continuance was filed in the middle of jury selection, and the record shows there had been eight continuances? There had been 11 continuances, actually. 11? Yes, some of them jointly with the government. Doesn't our case law basically say, in that case, because of the timing, that we have to give substantial deference to the determination by the trial judge that, now that the trial has commenced, I'm not going to grant any further continuances? If it was actually filed at that time, but the letter that forms the complaint and says, we're not ready to go to trial, the letter is actually before jury selection. Well, without regard to the letter, on the assumption that, for whatever reason, the trial judge was not aware of its contents, where is the abuse of discretion in a trial court saying, I've got 11 continuances, and now I have a mid-trial motion for continuance? Deny. We're going forward with jury selection. There was absolutely no showing that the government would be prejudiced. I mean, it was just a matter of expediting the trial. There was no showing. It gets back to Judge Silverman's question. What showing does your client have of prejudice from the fact that the court went forward with the trial? None on the record other than the client says, I was surprised at the defense, but I agree. Let me just go to really what I think is the heart of the appeal, and that is that this was a fairly simple, it was a simple drug case. This was a man who was extradited from Mexico, brought here on an earlier case, placed at one point in time, fairly early on, at GEO, which is a local federal contracted facility. And for some reason, the record is not entirely clear, he was placed in a single cell, a telephone was put in that single cell, and he had 24-hour-a-day, seven-day-a-week access to that telephone. And all of the calls that he made, some 1,200 calls, I think, during a period of time, were recorded. And during some of those calls, there was evidence that he had spoken with the mother of his children, Ms. Morones, and with Ms. Madriaga, and that there was a drug transaction. Counsel for Mr. Marquez moved to exclude evidence of the Mexican mafia. Mr. Marquez is alleged to be a member of the Mexican mafia. The government argued that evidence of structure and organization of the Mexican mafia was necessary to show how he could have done this, how he could have put together a drug transaction while he was in custody. And I asked this court to consider what the relevance was in this 40 pages, 36, 37 pages of testimony of Detective Gutierrez, plus the testimony of Delgado, another government witness, about the Mexican mafia. What the relevance was of the history and of violence of the Mexican mafia. There was no indication of any violence in this case or any threat of violence. What the relevance was of the feud between the northern and southern Hispanic gangs, drug sales on prison yards, tattoos, his work, Gutierrez's work in law enforcement on the Violent Crime Task Force, all of the operations he had worked on, that his brother, a member of the Mexican mafia, had been murdered, that there was an increase in murders at the California Department of Corrections as the Mexican mafia moved into prisons. Of what relevance is this? So your argument is relevance or the balancing by the district court under 403 of the admission of this evidence? Both. And also the prejudice that it caused, because... I think the standard of review is abuse of discretion. I think it is. But at this point in time, with the extent of the testimony, including taxation and extortion, no evidence of that in this case, the number of validated members of the Mexican mafia, hitting someone, killing someone who was in violation of the rules, that a member could not be homosexual, he would be killed, that violation of the hard rules resulted in death as a punishment, and that Mexican mafia members engage in a contest with law enforcement. Were there objections made to the scope of the testimony by trial counselors to all these points? Yes. Yes. No. Once the court made the decision that the structure and background of the Mexican mafia was relevant over counsel's objection to all of this, then as to each specific area of by Detective Gutierrez, counsel did not stand up and say, I object to that. Excuse me. Go ahead. Doesn't counsel have an obligation, even if the court overrules the objection to any mention of the Mexican mafia, if counsel believes that the scope of the evidence admitted is going well beyond the purpose for which the court originally admitted it, isn't it incumbent upon counsel to object? I think it was within the scope of what the court said. What he says in the excerpt of record at 18 to 20, he says, here the government argues the evidence of defendants' membership in the Mexican mafia is relevant to elements of association, planning, and knowledge, and motives to participate in the conspiracy. It's also relevant to show how the defendant was able to orchestrate drug deals from prison. Therefore, I believe this gang affiliation, and I think it was a very broad ruling, should be admissible. Now, I don't believe that counsel, under that broad a ruling of admissibility of Mexican mafia evidence, was obligated to preserve the record to, at every point along these different areas. Was there a post-trial motion for a new trial on this basis? No. No. So, we're still left with abuse of discretion and perhaps maybe clear error with regard to specific items of evidence? I believe so. I believe so. And just, I have 44 seconds left, and I just want to just read from closing argument where the government said, we do not intend to make this, I'm sorry, this was in the motion on the admission of this evidence, we do not intend to make this into a gang case that involves drug trafficking. It is a drug trafficking case that involves, by necessity, by its position in the Mexican mafia, some gang evidence. It went way, way beyond that, and I believe it went beyond that under the umbrella of the court. The only other thing that I would say with respect to the sufficiency of the evidence claim, I believe the prejudice of the admission of this evidence affected the verdict on the weight of the methamphetamine at issue. Thank you, Ms. Akin. And I have concluded all of my time. Thank you. Thank you. Do I pronounce your name right? Is it Ms. Akin?  Ms. Akin. Thank you. Good morning. Good morning, Your Honors. My name is Peter Mazza on behalf of the United States. Your Honors, picking up first with the issues of the continuance and the issue of substituting counsel, as Judge Tallman ruled and Mendez Sanchez, these two things often do, as counsel pointed out, come hand in hand, and this case is no different. The continuance request was made, in fact, during the impaneling of the jury. It was made during a lunch recess. The non-filed, non-docketed letter submitted by Mr. Marquez, the second of the four in total that he submitted, had been, he had dated it a week prior to trial, and the court received it over the lunch break on that first day of trial while the jury was in the panel. Interesting question. As you point out, as Judge Tallman has mentioned, too, this is not an uncommon scenario. It's hardly a month goes by we don't have a case where the client is complaining about the lawyer. This is the first one that I can remember where the judge says, I don't read these letters. Is that standard practice in San Diego, or is that unique to this judge, or just a fluke, or what? Thank you. It is not unique to this judge. It is pursuant to a local rule, 83.9, I believe, is the local rule, 83.9. So what happens if the client doesn't like his lawyer? What is he supposed to do? Well, he can bring a motion in court for a new attorney, or he can tell his attorney, You know what? How does he bring the motion? He can tell the judge during one of the more than a dozen pre-trials. He's got to be there in person. He can't send it in to the judge. Well, I don't think he can. Not by the way he did. He can't submit it directly to the judge the way that he did. If he wasn't in court and didn't make the motion orally, his other alternative, which is the one that, frankly, I've seen most commonly done by defendants who want a new lawyer, is to tell his existing lawyer, with all due respect, Mr. Brown, I would like a new lawyer. And then that lawyer has no choice. Okay, so one of his complaints is my lawyer doesn't see me, so he doesn't come to visit me. Well, he does over the course of the three years leading up to trial make many complaints. One of them certainly is that his lawyer did not see him as much as he would have liked. Okay, but let's stick with my question. You say he can tell his lawyer to go bring it up. He says, well, my lawyer doesn't see me, so I can't, you know, that's not a good alternative. I'm just not familiar with a rule that prohibits the client from telling the judge my appointed lawyer who doesn't see me isn't paying attention to me, and the judge says, I don't read these kind of letters. Get them out of my face. Yeah, sure. I'm sorry. I did not, I inartfully answered your question. And what I meant by going back to the three years prior to trial is that there were several times. These complaints about Mr. Brown, the trial counsel, were not new for Mr. Marquez. And Mr. Marquez appeared in front of the district judge a number of times after he had first raised this issue. You're telling me, again, I want to make sure I understand this. You're telling me that a client in the Southern District of California has no right to send in to the judge a complaint about his lawyer. That's true, Your Honor. We'll see if that remains true. And what the local rule specifically says is, and I would like to just make clear what happens in this instance, it is only the first page of whatever correspondence the defendant sends to the court. Any second page, any attachments are not recognized or docketed, put on the docket. And that happened in a couple instances. And so what does the rule say? You're getting ready to read us the rule. Yes, Your Honor. The rule says, quote, the document is not, and that's in all caps, to be filed, but instead rejected, all caps, and it is ordered, all caps, that the clerk serve a copy of this order on all parties. The order then is served alone. Is this a standing order? So what's the rule that the order is predicated upon? Yes, Your Honor. What does the local rule actually read? The local rule, it prohibits ex parte communications with the court. And so the judges in the Southern District of California consider a letter from a defendant complaining about his attorney and ex parte communication? They do. They've interpreted it that way. They do. Because when I was on the district court, if we got a letter like that, we would send it to the attorney and then follow up with a hearing. Well, yes. And that, I guess, goes back to my point with Judge Silverman, that there were a number of hearings subsequent to Mr. Marquez, first sending a letter to the court and then also raising these complaints about him. I think it's very important also to note, though, that even if you evaluate the substance of the letters, at no time does Mr. Marquez ever say, I want a new lawyer. He complains about him, to be sure. He does the way that many defendants, unfortunately, often do. But at no point in time does he ever say, I want a new lawyer, all the way up until his last letter, which arrived the first day of trial. And when the judge did then question him about it during voir dire, even then he does not say, I want a new lawyer. Do you think the outcome would have been different if the judge had not felt constrained by the local rule to disregard the letters? I don't believe it would have. I don't believe it would have because, again, he never asked for a new lawyer. And I think it's telling. When the judge did question him about it during that break, over the lunch break on the first day of trial, the judge read the letter, or excuse me, the defendant had a chance to explain what was in his letter, and based on that allocation, the judge construed it as a request to continue, not divining any sort of request for a new lawyer from Mr. Marquez at that point in time. But he did identify for Mr. Marquez a request for an eighth continuance of the trial. So I think that's telling in that the judge, he had no way of knowing that this is in fact what Mr. Marquez wanted. Mr. Marquez, at the time that he addressed the court, even said, I don't think we're prepared as a means to substantiate his request to continue. And do you get, as a U.S. attorney, do you get a copy of the letter as well? Both parties get a copy of the order rejecting the letter, and then we get a copy of the first page of whatever has been submitted. So you don't get the complete document? No, Your Honor. Has there ever been a time where the U.S. attorney asked for a hearing? Because somewhere on the first page of the document, there was a request for a new counsel? Not that I'm aware of, Your Honor. So you just file these things in your pleading file and call the case for trial? Well, to be sure, they are not filed. I think the purpose of posting- No, I'm just trying to figure out, I mean, I'm pursuing Judge Silverman's concern, and that is, if there truly is an irreconcilable conflict between the lawyer and the client, are you telling me that under the way this rule is applied, the only way to bring that issue to the court's attention is for the lawyer with whom the client says he's broken down his relationship must affirmatively ask to be relieved and new counsel substituted? Either that, or at a hearing in which the defendant is present, he could address the court directly. And you're saying if he really had suffered such a breakdown, he had many opportunities to do it in the courtroom, but never said anything? That's correct. That's correct. And as a matter of fact, well, okay, going to your first- So the defendant just gets up, they're having a status check, and the defendant just gets up and says, excuse me, Your Honor, but I have a problem with my lawyer. Do you think the judge would entertain such an interruption? Your Honor, I would hazard to say that it's not uncommon. And here you had Mr. Marquez. Mr. Marquez knew full well that he had written that letter, of course, at the day of trial, as well as at a status conference that was held the day before trial. So after he had- But I thought there were four letters, and we're only talking about one. What happened to the other three? When were they written, or lodged, or first-paid docketed, or whatever the practice is? Yes, Your Honor. The dates are as follows. The first was delivered on April 7th, 2009. That is the only one, the first one. That is the only one that was truly pretrial. And in that one, Mr. Marquez tells the court that he had received discovery, but it had infrequent visits from his attorney, he had been moved a lot, and he had medical issues. I think that first letter fairly encapsulates Mr. Marquez's recurring concerns. The second letter, which was dated March 2nd, 2011, received by the court March 9th, the first day of trial. This is one in which emails were attached- March 9th of what year? 2011, Your Honor. So, two years later? That's correct. That's his second letter. And then his third and fourth letters both come after his trial. The third one on July 11th, 2011, in that letter Mr. Marquez complains that he hadn't seen his attorney since trial, and that he was never asked in the four and a half years of the case whether he wanted a continuance. That is completely implausible, because there was upwards of six of the continuance requests that took place in court while Mr. Marquez was, of course, present. And the fourth letter was dated March 29th, 2012. This was a post-trial letter to a magistrate judge detailing Mr. Marquez's post-trial efforts to replace his trial counsel, which ultimately- Does that violate the rule? It does.  What did the magistrate judge do with the letter? Well, what happened was Mr. Marquez's request for new counsel, he made it at sentencing for the first time. He told the trial judge, you know, what's done is done, but on my appeal, I cannot have Mr. Brown. And at that point, he eventually got Ms. Misaki unappointed for his appeal by one of the other magistrate judges. Let me change gears for a second and ask you about the evidence in the case. Do I understand that the government had recordings of Mr. Marquez doing drug deals from custody? That's correct, Your Honor. And- That's pretty good proof. So why do you need to call a gang expert to tell everybody he's a member of the Mexican Mafia? For the reasons we stated in the in-limb motion, and that was to provide the jury with an understanding of the relationships between the participants. All of the participants were Mexican Mafia associates or senores. Why is that necessary? Because we felt that it was necessary to give the jury an understanding of how an individual who is incarcerated 24 hours a day, in his cell 23 out of 24 hours a day, was able to orchestrate a series of methamphetamine deals and give direction to people that they followed on the street. I get that if you don't have them on tape doing it. If you have them on tape doing it, why do you need this other stuff? Well, I think it was important because the defense, of course, was that a drug deal took place. Obviously, it couldn't run from that. But it didn't involve Mr. Marquez. It involved Ms. Morones. It involved Ms. Madriaga. It involved the confidential informant. But it didn't involve Mr. Marquez. And the audio recordings, while certainly helpful, of course, weren't spoken in clear, plain English. There was coded language in ambiguity. You have the right to have the phone calls translated into English. I understand. Oh, no, no. I'm sorry. I didn't mean to say that they weren't in the English language. I know. What I meant was you have the right to have it translated out of the code into English that people understand. True enough. Of course, we can. And we can. You still haven't quite answered why do you then need, once you have him on tape speaking in this code, and once you have somebody translating the code, why do you need to belabor the point that he is a big shot in the Mexican Mafia and all the bad things the Mexican Mafia do? Well, regarding the bad things the Mexican Mafia does, I think it's important to note that over half of Mr. Detective Gutierrez's testimony came to establish his qualifications as an expert in this area. At any point, Mr. Brown, the defense counsel, could have stipulated to it. It could have been taken outside the presence of the jury. At the close, when the government tenders- You're not a shot caller. What's the relevance of the fact that this guy can order people murdered from his prison cell? He's not charged with that. I don't believe there was testimony that Mr. Marquez could order someone murdered from his prison cell. I think the testimony was, it did involve the potential repercussions for violating the Mexican Mafia rules as a general matter, but there was never anything violence-related- to give an understanding to the hierarchical structure of the Mexican Mafia. Why did they need to understand the hierarchical structure if you have him on tape doing the crime? Because, again, while that evidence certainly was helpful, we have the- What evidence was helpful? The audio tapes that I believe- That's him doing the crime right on tape. Correct. So more than helpful, I mean, that's the grovelment of the offense, right? Certainly. Of course, the defendant is entitled to a fair trial, not a close trial, and our job was to prove the case and inform the jury about the relationships between the two and the hierarchical structure as it related to Mr. Marquez. It's important to understand that he was the member. He was one of 150 members that the Mexican Mafia has. So are you saying the jury needed to hear that because that's the only explanation for why these people would do his bidding when the orders are coming from a prison cell? That is true. And that's- Because they're afraid of him? Or because if they don't, they're going to be whacked? No. What the testimony from Ms. Madriaga, who is the wife of a fellow San Diego area Mexican Mafia member, was, was that, one, she was afraid of the confidential informant. She didn't like to do business with that guy. Two, drug traffickers don't willingly give up their sources of supply, and it was only because of Mr. Marquez and who he was, both his position of power in the Mexican Mafia and his relationship as a fellow brother with her husband, that she participated in the manner in which she did, which was to provide her source of supply to Ms. Morones on Mr. Marquez's behalf. And that was also relevant to the conspiracy, to establishing a conspiracy among the participants. Certainly. Thank you, Mr. Maza. Ms. Hockeyn, you're out of time, but if you want to take one minute for rebuttal and you'll keep it to a minute, we'll put a minute on the clock. Thank you. I would just like to address the issue of these letters. When a defendant gets a document such as appears in the excerpt of the clerk's record that says this document is not to be filed, but instead rejected and ordered that the clerk serve a copy on all parties, that is a very chilling effect for someone to later say in court. Typically what happens, and I'm sure this court has experienced that, is a defendant says, I would like to say something to the court, and the court says, you have an attorney, talk to your attorney. And one of the points is that this attorney never brought up to the court the fact, and neither did the government, but the responsibility really was on the attorney, bring up to the court so that the court could make a determination of whether there was a breakdown in the attorney-client relationship. All he has to say is, I don't want this lawyer on appeal, and he gets you, right? No, what happened is, I don't want this lawyer on appeal, Brown stays on the appeal, Brown fails to file the AOB, Brown asks for an extension, and then finally a year later, Brown asks to be relieved, and I'm appointed. We appointed you, not the district. Exactly. It took 21 days, I think it was, short of a year for him to get a new attorney on appeal. Thank you very much. Thank you. Mr. Mazza, thank you.
judges: SILVERMAN, TALLMAN, RAWLINSON